# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| RONNIE FINCH, | ) |
| Petitioner, | ) ) ) |
| v. | ) Case No. 3:08-0129 ) Judge Echols |
| TONY PARKER, | ) ) |
| Respondent. | ) |

## MEMORANDUM

This is a habeas corpus action brought under 28 U.S.C § 2254. The Magistrate Judge has issued a Report and Recommendation (Docket Entry No. 27), recommending that the petition for writ of habeas corpus be denied and the action be dismissed. Petitioner has filed objections (Docket Entry No. 28) to the R & R.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The record reflects that on July 13, 2000, a Davidson County, Tennessee jury found Petitioner guilty of facilitation of first degree murder and two counts of facilitation of attempted first degree murder as a result of his involvement in a shooting which led to the wounding of one individual, and the death of another. Petitioner was jointly tried with two other defendants. Upon conviction Petitioner was sentenced to forty-nine years imprisonment and is incarcerated at the West Tennessee State Penitentiary.

After his conviction and sentence were affirmed on direct appeal, State v. Huey, 2006 WL 517132 (Tenn. Crim. App. 2002), Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel. Initially, he was successful on that claim when the Tennessee Court

1

of Criminal Appeals ruled that (1) trial counsel was ineffective in failing to object and continuing to participate in Petitioner's case when the trial judge took his Motion for Judgment of Acquittal under advisement; and (2) this action prejudiced Petitioner. Finch v. State, 2006 WL 264330 (Tenn. Ct. App. 2006)("Finch I"). However, on appeal by the state, the Tennessee Supreme Court held that while counsel erred in failing to object when the trial court erroneously took his motion for judgment of acquittal under advisement and continued to participate in the trial, this deficient performance did not result in prejudice to the Petitioner because, even at the close of the state's case, the evidence was sufficient to convict the Petitioner on the crimes charged. Finch v. State, 226 S.W.2d 307 (2007)("Finch II"). The present Petition followed.

In his Petition, Petitioner raises four grounds as a basis for relief. He claims (1) the evidence was insufficient to sustain his convictions; (2) the trial court erred when it allowed the introduction of evidence of prior altercations between the Petitioner and one of the victims; (3) the trial court erred when it took Petitioner's Motion for Judgment of Acquittal under advisement; and (4) counsel was ineffective by not objecting when the Motion for Judgment of Acquittal was taken under advisement and then participating in cross-examining a witness put on by his co-defendants during their defense. The Magistrate Judge determined the second and third claims were procedurally defaulted, and the first and fourth claims were without merit given the record.

Because the issue of the sufficiency of the evidence is central to Petitioner's non-defaulted claims, it is necessary to recite the facts underlying the case in order to place the Magistrate Judge's conclusions and Petitioner's arguments in perspective. The Tennessee Supreme Court set forth the relevant facts of this case as follows:

> This case arises out of a gunfight in May 1998 that left Ben White dead and
> Leo White injured. The proof adduced during the State's case-in-chief established

2

that the Petitioner and Jerome Jones argued in front of Jones' residence in the Settle Court Apartments in Nashville, Tennessee. Jones lived in a downstairs apartment toward one end of a two-story building.

Although the Petitioner did not threaten Jones during the argument, Jones spent the rest of the day in his apartment in order to avoid "trouble." Jones testified that when he looked out of his window later that day, he saw the Petitioner "running down the sidewalk with a gun in his hand." Sharon Sanders, who shared Jones' apartment, also saw the Petitioner with a handgun at their building that day.

The next day, the Petitioner came to Jones' apartment accompanied by codefendants Frank Huey and Jeffrey Gills. Jones took the Petitioner and Huey into his bedroom where they could talk privately, as Sanders and numerous children were also in the apartment. Gills remained in the living room. Once in the bedroom, the men accused Jones of having threatened to kill the Petitioner. Huey pulled out a .38 pistol and hit Jones on the head with the gun, causing Jones to bleed. According to Jones, the Petitioner made no attempt to stop Huey. Huey then held the gun to Jones' head and walked him out of the bedroom toward the front door of the apartment. Sanders heard Huey say that he was going to take Jones outside and shoot him. In the living room, Huey encountered Jones' cousin, Michael White, who had just entered the apartment. Huey pointed the gun at White and indicated that the altercation was not his business. Huey then left the apartment through the front door and fired a single shot into the air. The Petitioner and Gills left the apartment through the back door.

Sherry Stevens, Jones' aunt, lived across the street from Jones. She saw Huey leave Jones' apartment and fire a gun into the air. Stevens heard Huey say, "that will teach them to mess with my family."

Following this incident, Jones left his apartment and stayed gone for several hours. He returned during the evening with Harold Blair. Jones was under the impression that Blair was going to provide him a gun for protection. Word of the altercation had spread, and more trouble was feared. Jones' two uncles, Ben White and Leo White, also came over to visit. Leo backed his sedan into a parking space in front of Jones' apartment. Jones testified that Leo had a gun in the trunk of the car that he intended to give Jones for Jones' protection.

According to Jones, his uncles were standing near the trunk of Leo's car, Blair was on the porch in front of Jones' apartment, and Jones was walking away from his uncles and toward the porch when gunfire erupted. Jones testified that the shots were being fired from three locations: from just outside the far front corner of the building in which his apartment was located, from a location between that corner and the near side of the street, and from a location in the street closer to its far side[.]

With the eruption of gunfire, Jones ran up on the porch in front of his apartment and joined Blair. The two men then ran up the stairs in the breezeway that ran alongside Jones' apartment. Blair fired a pistol several times toward the area in back of the building. Jones testified that he thought Blair's gun was a .45. Jones did not see anyone else with a gun. Jones testified that he was unarmed and that neither Ben nor Leo was armed when the shooting began.

3

Leo White testified that he and Ben and Jones were standing around Leo's car while Leo was preparing to open his trunk and show Ben a handgun. As Jones began walking off and as Leo opened the trunk, gunfire erupted. Leo explained that he was facing his trunk and the shots were coming from his right. Leo turned to his left and ran to hide between his car and the car next to it. Ben was right behind him. Leo testified that he heard five shots, with the last one hitting him in the back of his leg. He ducked beside his car, "on the opposite side of the car from where the shots were coming from." His brother was lying down at the back of the car, shot. Once the shots started, Jones "went towards his apartment." Leo stated that, once he was shot, he did not hear anything else. Ben was shot twice and died from his gunshot wounds.

Sherry Stevens also witnessed the beginning of the gunfight. As she was preparing to cross the street toward Jones' apartment, she looked to her left and saw Gills in the street walking toward the building in which Jones' apartment was located. She also saw the Petitioner and Huey coming around the far corner of that building toward the street. Gills, Huey, and the Petitioner congregated in the same general vicinity. As Stevens crossed the street, she saw Gills point a handgun toward Leo and Ben and begin to shoot. She ran and sought cover in Jones' apartment.

Other witnesses also saw portions of the gunfight. Sanders was on the porch of Jones' apartment when the shooting began. She saw Gills standing in the street and pointing a gun at Jones' apartment. Christopher Works saw Huey at the side of the building with a rifle. According to Works, that is the location from which the shooting began. Works' mother, Janice Goff, also saw Huey at the side of the building. Goff saw Huey shooting the gun, which she described as longer than a pistol and appearing "sawed-off." Goff also saw a man in the middle of the street with a gun the size of a pistol.

\* \* \*

Steve Scott, from the Tennessee Bureau of Investigation crime laboratory, testified that thirteen of the fourteen nine-millimeter shell casings found in the area where the defendants had been seen were fired from a single nine-millimeter gun. One of the nine-millimeter shell casings found in this area was fired from a different nine-millimeter weapon. The three 7.62 x 39 caliber shell casings also found in the area where the defendants had been seen were fired from at least one additional gun[.]

Finch II, 266 S.W.3d at 310-312. Based on these events, Petitioner, Huey and Gills were charged with first degree murder and attempted first degree murder, among other crimes. As indicated, Petitioner ultimately was convicted and sentenced for the lesser included offenses of facilitation to commit murder and the facilitation to commit attempted murder.

## II. STANDARD OF REVIEW

When a party makes timely objections to a Report and Recommendation, the Court "shall make

4

a de novo determination of the matter and may conduct a new hearing, take additional evidence, recall witnesses, recommit the matter to the Magistrate Judge for further proceedings and consideration, conduct conferences with counsel for the affected parties, and receive additional arguments, either oral or written, as the District Judge may desire." L.R.M.P. 9(b)(3).

### III. LEGAL ANALYSIS

Petitioner first argues that the Magistrate Judge erred in concluding that Petitioner had procedurally defaulted on his second claim relating to the allegedly erroneous introduction of evidence by the trial court, and his third claim relating to the trial court's failure to rule on the Motion for Judgment of Acquittal at the close of the state's case. Petitioner argues he exhausted those claims in both his direct appeal and in his Application for Permission to Appeal.

As the Magistrate Judge correctly observed, a condition precedent to federal habeas corpus relief is that a Petitioner present each claim to the state court for review. See, Rose v. Lundy, 455 U.S.C. 509, 522 (1982). This is because "[h]abeas review is not a broad exercise of supervisory power, but is limited to constitutional error" and therefore "[t]o be eligible for habeas relief on any given claim, a state prisoner must fully and fairly present his claims, as a matter of federal law, to state courts." Standford v. Parker, 266 F.3d 442, 201 (6th Cir. 2001).

The Sixth Circuit has explained that in determining whether a petitioner has exhausted his state law claim for purposes of federal habeas review, a court should "look[] to the petitioner's: '(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.'" Slaughter v. Parker, 450 F.3d 224, 236 (6th Cir.

5

2006)(quoting, Whiting v. Burt, 395 F.3d 602, 613 (6th Cir.2005)). "While a petitioner need not cite 'chapter and verse' of constitutional law, general allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." Id. (citation omitted).

A review of Petitioner's direct appeal and his Application for Permission to Appeal indicates that he did not present either his second or third claims as federal constitutional claims. The second claim relating to the introduction of prior altercations was argued in only his direct appeal with the focus being whether, under state law, the court erred in failing to limit the state's proof to matters contained in the indictment. While counsel noted that Tennessee had adopted certain provisions of the Federal Rules of Evidence, he did not suggest that the alleged violation in this case violated federal constitutional law. To the contrary, his argument was simply (1) that an altercation with one of the victims the day before was not material or relevant to the issue of whether Petitioner was somehow involved in the shooting the next day, and (2) the trial court did not follow the dictates of the Tennessee Supreme Court in State v. Gilland, 22 S.W.2d 266, 272 (Tenn. 2000) by carefully balancing the need for background evidence to complete the picture and the "general prohibition against evidence only offered to show criminal propensity."

Petitioner's claim regarding the taking of the Motion for Judgment of Acquittal under advisement by the trial court was raised in both his direct appeal and in his Application for Permission to Appeal. Here again, however, the argument addressed claimed violations of state law. Specifically, Petitioner argued that Rule 29 of the Tennessee Rules of Criminal Procedure requires that a court either grant or deny a motion for judgment of acquittal at the close of the state's case and does not allow for such a motion to be taken under advisement. Petitioner further argued that the

6

actions taken by the trial court were in direct contravention of Mathis v. State, 590 S.W.2d 449, 452 (1979) which held that, under Tennessee's trial rules, a trial court must direct a verdict of acquittal at the close of the state's case when the evidence is insufficient to support a conviction. In neither his direct appeal, nor in his Application for Permission to Appeal, did Petitioner raise a federal constitutional claim, or even cite a federal case in relation to this issue. This objection is overruled.

Petitioner argues the Magistrate Judge "uses 'case-law' that is no longer good law." (Docket Entry No. 28 at 2). Specifically, Petitioner faults the Magistrate Judge's citation to Nevers v. Killinger, 169 F.3d 352 (1999) which was abrogated by Harris v. Stovall, 212 F.3d 940 (6th Cir. 2000).

The Magistrate Judge cited Nevers for the settled proposition that when a claim has been adjudicated on the merits in state court, that adjudication will not be disturbed unless it resulted in a decision contrary to clearly established federal law or involved an unreasonable application of federal law in light of the evidence. Harris abrogated Nevers only insofar as it linked the "unreasonable application of clearly established federal law" to whether it was "debatable among jurists" and did so based upon the intervening decision of the United States Supreme Court in Williams v. Taylor, 120 S.Ct. 1495 (2000). In Williams, the Supreme Court held that a decision of the state court is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Id. at 1523.

In this case, after citing Nevers not for the subjective "reasonable jurist standard," but rather in conjunction with a basic overview of 28 U.S.C. § 2254(d), the Magistrate Judge correctly set forth the test in Williams. Specifically, the Magistrate Judge wrote:

7

> In order for a state adjudication to run 'contrary to clearly established federal law, the state court must arrive at a conclusion opposite to that reached by the United States Supreme Court on a question of law or decide a case differently than the United States Supreme Court on a set of materially indistinguishable facts. In order to obtain the writ for an 'unreasonable application' of federal law, the petitioner must show that the state court identified the correct governing principle involved but unreasonably applied that principle to the facts of the case. Williams v. Taylor, 529 U.S. 362 (2000). In short, state court judgments must be upheld unless, after the closest of examination of the state court judgment, the Court is firmly convinced that a federal constitutional right has been violated. Id. at [sic] 529 U.S. [at] 389.

(Docket Entry No. 27 at 6). Since the Magistrate Judge properly relied on Williams in reviewing Petitioner's claims, this objection is overruled.

Petitioner next argues the Magistrate Judge erred in concluding there was sufficient evidence to support his convictions. This general insufficiency of the evidence argument is related to Petitioner's next objection which claims the Magistrate Judge erred in finding no prejudice to Petitioner when counsel failed to object after the Motion for Judgment of Acquittal was taken under advisement and counsel continued to participate in the trial. Petitioner claims that at the time the Motion for Judgment of Acquittal was raised at the close of the state's case, counsel should have insisted that the trial court rule on the motion since there was insufficient evidence at that time for a conviction. This error was prejudicial because during the defendant's proof (put on by Petitioner's co-defendants) further evidence was introduced against Petitioner. As support for these objections, Petitioner points to the opinions of the Tennessee Court of Criminal Appeals in relation to his petition for post-conviction relief and the state's petition for rehearing.

In its opinions granting post-conviction relief and denying the state's petition for rehearing, the Tennessee Court of Criminal Appeals discussed the sufficiency of the evidence claim in the limited context of whether counsel was ineffective. Specifically, the Court of Criminal Appeals confirmed its holding on direct appeal that, when all of the evidence at trial was considered, there

8

was indeed sufficient evidence to convict Petitioner on the crimes with which he was charged. Finch I, 2006 WL 264330 at *8, n.1. However, the court also concluded that at the close of the state's case, the only evidence against Petitioner was that he was at the scene of the crime, and "mere presence" is insufficient to support a conviction. Had counsel properly objected to the taking of the Motion for Judgment of Acquittal under advisement, he would have been able to argue effectively on appeal that the evidence at the close of the state's case was insufficient to convict. The court reasoned it was only during the presentation of the case by Petitioner's co-defendants that sufficient evidence developed to convict Petitioner and this occurred when one of the co-defendants called a witness who stated that she not only saw Petitioner at the scene of the shooting, but saw him at the scene with a weapon. Id. at **7-8.

However comforting this decision may have been to the Petitioner, it was not the final say on the matter in the Tennessee state courts. On review, the Tennessee Supreme Court agreed with the Court of Criminal Appeals that counsel was ineffective because Mathis teaches the proper procedure is for counsel to object to a trial court's refusal to grant a Motion for Judgment of Acquittal, or risk waiver of the claim on appeal. However, the Tennessee Supreme Court also ruled that counsel's ineffectiveness was not prejudicial to Petitioner because by the close of the state's case (when counsel should have insisted that the trial court rule on the Motion for Judgment of Acquittal), sufficient evidence existed to convict the Petitioner.

In the context of Petitioner's present federal habeas corpus action, the Court must reject Petitioner's general insufficiency of the evidence claim. A conviction is supported by sufficient evidence if, after viewing all the evidence and the inferences to be drawn therefrom in the light most favorable to the prosecution, the court can conclude that any rational trier of fact could have found

9

the essential elements of the crime beyond a reasonable doubt. As the Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979) explained:

> [T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Woodby v. INS, 385 U.S., at 282, 87 S.Ct., at 486 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See, Johnson v. Louisiana, 406 U.S., at 362, 92 S.Ct., at 1624-1625. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. at 312.

Here, all of the courts which have considered the matter, including the Tennessee Court of Criminal Appeals on direct and collateral review, the Tennessee Supreme Court, and the Magistrate Judge have concluded that when the entire record (as opposed to merely the state's case-in-chief) is considered, sufficient evidence was developed to convict Petitioner of facilitating first degree murder and facilitating attempted first degree murder. This Court perceives no constitutional infirmities in those decisions and can find no basis to conclude that the jury was presented with insufficient evidence upon which to convict Petitioner of facilitation of first degree murder and facilitation of attempted murder. Accordingly his third objection to the R & R is overruled.

The more interesting issue presented, however, is whether Petitioner suffered prejudice as a result of counsel's failure to object and his continued participation in the trial when the trial court took the Motion for Judgment of Acquittal under advisement after the completion of the state's proof in chief. As an initial matter, Petitioner would succeed on this claim if he could show that the state

10

trial judge would have granted the Motion for Judgment of Acquittal had she been pressed to make a ruling. However, this avenue is foreclosed because, during the evidentiary hearing on the Petition for Post Conviction relief in the state court, the trial judge stated that while she did not rule on the Motion for Judgment of Acquittal at the time it was presented, she would "not have granted it no matter what." (Addendum No. 3, Vol. II at 25). In a subsequent written ruling, the trial court "admitted it made a mistake but clarified that even though it had taken the motion for judgment of acquittal under advisement, it had not intended to grant said motion; instead, it would have denied Petitioner's request." (Addendum 3, Vol. I at 35). There being nothing to the contrary in the record, the Court must conclude based upon the post-conviction proceedings that the trial judge was not inclined to grant the Motion for Judgment of Acquittal.

However, the post-conviction proceedings occurred after-the-fact and the real issue, therefore, is whether, at the close of the state's case-in-chief, sufficient evidence existed to convict Petitioner on the crimes charged. If there was sufficient evidence to constitute proof beyond a reasonable doubt at that point, then counsel's failure to object and not participate any further did not result in prejudice because the conviction would have been affirmed on appeal.

Both the Tennessee Supreme Court and the Magistrate Judge concluded that sufficient evidence existed at the close of the state's case-in-chief to convict Petitioner of facilitation to commit first degree murder and facilitation to commit attempted first degree murder. Having independently reviewed the matter, this Court agrees.

By the conclusion of the state's case, the jury had been presented with evidence from which it could conclude the following. A day before the shooting, Jones and Petitioner had an argument and later that same day Petitioner was seen carrying a handgun in the vicinity of Jones' apartment.

11

The next day, the Petitioner and his co-defendants Gills and Huey visited Jones at his apartment and accused Jones of threatening to kill Petitioner. One of the co-defendants, Huey, in Petitioner's presence, hit Jones in the head with a pistol and then tried to take him outside by placing the pistol against his head. This was thwarted by the arrival of Jones' cousin who was told to mind his own business while the pistol was pointed at him by Huey. When Huey exited the apartment, he fired the pistol in the air and said, "this will teach you to mess with my family."

Later that evening, the Petitioner and his co-defendants were seen congregated together near Jones' apartment immediately before the shootings occurred. Jones and his two uncles, Ben and Leo White, were standing around Leo's car in front of Jones' apartment when the shooting began. Jones and his uncles were unarmed. During the shooting, witnesses observed Gills firing a handgun at Leo and Ben White, and Huey shooting a rifle near the corner of the building towards the area where Jones and the victims (his uncles) were standing in front of Jones' apartment. Petitioner was seen coming around the corner of the building with Huey.

The evidence gathered at the scene of the crime established that at least three guns had been fired from the vicinity in which the Petitioner, Huey, and Gills had been seen during the gunfight. No evidence was introduced which would indicate that anyone other than Petitioner and his co-defendants were in the area where the shooting originated from, and no witness indicated that either Huey or Gills had more than one gun.

In view of the facts of the earlier altercation the same day between Petitioner and Jones, that Huey threatened and hit Jones in the head with a pistol in Petitioner's presence, that only Petitioner and his co-defendants were observed in the area from which the shots were fired, that three weapons (two handguns and a rifle) had been used during the shooting, and that a handgun had been seen in

12

the possession of Gills and a rifle in the possession of Huey, a reasonable jury could infer that Petitioner was involved in the shooting and that he fired one of the two handguns which were used during the shooting. The jury could also conclude that Petitioner and his co-defendants ambushed a group of individuals with the intent to kill or attempt to kill the targeted individuals. Since one victim died, and another was injured, the jury could readily find the elements of facilitation to commit first degree murder and facilitation to commit attempted first degree murder. See, State v. Melton, 2006 WL 2563376 at *4 (Tenn. Ct. App. 2006)(to establish facilitation of a felony, the state must prove: "(1) the commission of a specified felony; (2) that the accused knew another person was going to commit a specified felony; and (3) that the accused knowingly furnished substantial assistance in the commission of the felony although the accused did not possess the requisite intent to be guilty of the felony"). Accordingly, Petitioner's objection relating to the sufficiency of the evidence at the close of the state's case-in-chief when the Motion for Judgment of Acquittal was improperly taken under advisement will be overruled.

While the Court finds there was sufficient evidence to support Petitioner's conviction (and thus Petitioner was not prejudiced by counsel's ineffectiveness in failing to object), the Court also finds that reasonable jurists could disagree and therefore will issue a Certificate of Appealability on this issue. See, Harbison v. Bell, 503 F.3d 566, 569 (6th Cir. 2007)(a Certificate of Appealability is appropriate where "reasonable jurists could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues raised are adequate to deserve further review"). In this case, it is clear that reasonable jurists could disagree on whether there was sufficient evidence to convict the Petitioner at the close of the state's case-in-chief as evidenced by the Tennessee Court of Criminal Appeals concluding there was not, and the Tennessee Supreme

13

Court, the Magistrate Judge and this Court concluding otherwise.

Finally, Petitioner, in a wholly conclusory fashion, objects to the R & R claiming that "contrary" to the R & R, "the State Court judgment with respect to petitioner's claims w[as] contrary to clearly established federal law and did involve and [sic] unreasonable application of federal law in light of the evidence." (Docket Entry No. 28 at 3). This Court has thoroughly reviewed the entire state court record as well as the filings made in this case, and, apart from the issues just described, discerns no basis for concluding that the state courts acted contrary to clearly established federal law or unreasonably applied federal law to the evidence. As such, this objection is overruled.

## IV. <u>CONCLUSION</u>

On the basis of the foregoing, the Magistrate Judge's R & R (Docket Entry No. 27) will be accepted and approved, and Petitioner's objections thereto (Docket Entry No. 28) will be overruled. The Court will deny the Petitioner's "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by Person in State Custody" (Docket Entry No. 1) and dismiss this case. However, the Court will issue a Certificate of Appealability on the issue of whether counsel's ineffectiveness prejudiced the Petitioner in light of the evidence which had been produced by the State at the close of its case-in-chief.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE